UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Cletus E. Schneider,

Petitioner,

vs. REPORT AND RECOMMENDATION

James H. Bruton,

Respondent. Civ. No. 00-1628 (PAM/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 1st day of March, 2001.

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon a Petition for a Writ of Habeas Corpus, which alleges that he is being incarcerated in violation of the Constitution, Laws, or Treaties of the United States. See, Title 28 U.S.C. §2254(a). The Petitioner has appeared pro se, and the Respondent has appeared by Nicole E. Nee, Assistant Dakota County Attorney. For reasons which follow, we recommend that the Petition for Habeas Corpus be denied.

II. Factual and Procedural History

The Petitioner is currently serving a life prison term, at the Minnesota Correctional Facility in Stillwater, Minnesota ("MCF-

MAR 01 2001 CLERK

21

Stillwater"), which was imposed by the Dakota County District Court, on March 19, 1998. The Petitioner was sentenced following a conviction for Murder in the First Degree (Premeditation), Murder in the First Degree (While Committing Burglary), Murder in the Second Degree (Intentional Murder), and Murder in the Second Degree (Order for Protection), in violation of Minnesota Statutes Sections 609.185(1), 609.185(3), 609.19, Subdivision. 1(1), and 609.19, Subdivision 2(2).

On June 13, 1997, at 7:00 o'clock p.m, the body of Dorothy Sandburg ("Sandburg") was found lying face up on the floor of the entryway to her Burnsville home. She had been bludgeoned across the head and, therefore, the skin on her head was lacerated, her brain was injured, and her orbital plates were fractured. However, these injuries were not the cause of Sandburg's death. The cause of Sandburg's death was determined to be manual strangulation.

On June 12, 1997, which was the day before she was discovered, Sandburg had traveled from her home, to her place of employment, which was located in St. Cloud, Minnesota. After working for the day, Sandburg reportedly left at approximately 4:00 o'clock p.m., presumably to proceed home. This was the last time that Sandburg was seen alive. The next day, Sandburg's sister, Colette Johnson ("Johnson"), became concerned because she was unable to contact her sister, and because Sandburg's employer had informed her that

Sandburg had not reported to work that day. As such, Johnson contacted her sister, Ione Picciano ("Picciano"), and her brother-in-law, George Picciano ("Picciano"), and proceeded with them to Sandburg's residence at approximately 7:00 o'clock p.m.

Upon their arrival, they attempted to open the front door of Sandburg's residence but, because Sandburg's body was blocking the door, the group was only able to open the door approximately six inches. Johnson was able to peer though that opening, however, and observe blood on the floor. Immediately, the police were summoned. When the police arrived at Sandburg's residence, they attempted to enter the front door, and discovered Sandburg's lifeless body. Thereafter, the police searched the exterior of the residence, which failed to identify any evidence of a forced entry. The police also failed to discover any evidence of a burglary.

Near Sandburg's body, police uncovered an ATM envelope, an advertisement, a lunch sack, a set of car keys, and a purse. Sandburg was wearing her work clothes, and her car was parked in the circular driveway in front of her home. This evidence indicated that Sandburg had been attacked shortly after her entry into the home. Located underneath Sandburg's wrist was a boat tiller, that was normally stored in the basement of the residence. The coroner,

who investigated the scene, concluded that, at the time she was discovered, Sandburg had been dead for approximately 24 hours.[1]

In addition to the foregoing evidence, investigators with the Minnesota Bureau of Criminal Apprehension ("BCA") collected five drops of blood from the area in which Sandburg's body was discovered. One drop of blood was collected from Sandburg's abdomen, and three drops were obtained from the floor near her body. These drops were circular, which revealed that they had fallen from a source located directly above the spot at which the drop was found. The fifth drop of blood was located on Sandburg's left shoe.

The following day -- on June 14, 1997 -- the police interviewed the Petitioner at the residence of his daughter. Apparently, the Petitioner had been residing with his daughter since December of 1996, when a Court Order was issued to preclude him from entering Sandburg's home in Burnsville, Minnesota. The Protective Order was issued in December of 1996, and arose from the dissolution of the marriage between the Petitioner and Sandburg.

The Petitioner and Sandburg were married in 1972. During the course of their marriage, the Petitioner and Sandburg were both employed, and primarily kept their earnings separate. While the

---

[1]An autopsy revealed that Sandburg's head injury was consistent with having been struck, in the head, by the boat tiller that was found beneath her wrist.

Petitioner claimed to be frugal with his earnings, he considered Sandburg to be a spendthrift. In addition, the Petitioner believed that Sandburg was a narcissist, and that she had emotionally, and verbally, abused him throughout the course of their marriage.

On June 14, when the police arrived at the home of the Petitioner's daughter, they informed him of Sandburg's death, and then commenced an interview. According to the officers conducting the questioning, the Petitioner appeared nervous, and did not inquire about Sandburg's cause of death until forty-nine minutes into the interview. During the interview, the Petitioner appeared to have a dry mouth, and he gagged. The Petitioner advised the officers about the impending dissolution of his marriage with Sandburg, and about the financial stress that they were experiencing. When the officers asked who might benefit from Sandburg's death, the Petitioner responded that her sons, from her previous marriage, were the beneficiaries of her life insurance policies. The Petitioner did not inform the police, however, that he was the beneficiary of over $200,000 worth of insurance policies on Sandburg's life. At this time, police officers noticed an injury to the Petitioner's thumb. However, when they inquired about the injury, the Petitioner hid his thumb from their view.

Subsequently, the Petitioner allowed the police to search the residence, and to seize a variety of items, including the clothes

that he claimed to have been wearing on June 12th, which had since been laundered.[2] The Petitioner also consented to the seizure of his truck, and of several of his tools. The Petitioner stated that he had been at his daughter's home during the time period in which the murder of Sandburg was believed to have occurred.[3]

On June 18, 1997, the Petitioner submitted to another interview at the police station. During that interview, the Petitioner told police that Sandburg was obsessed at getting him, and that she was probably killed because of her "unyielding nature." The Petitioner also complained that Sandburg was incapable of controlling her spending habits. However, the Petitioner denied that he killed Sandburg.[4]

On August 11, 1997, police received the DNA results on the testing of the five drops of blood that had been secured at the crime scene. The blood samples were subjected to DNA analysis by

---

[2]A police search did not uncover any blood on the clothing that the Petitioner claimed to have been wearing on the night of murder.

[3]Although the Petitioner claimed to have been at his daughter's residence at the time of the murder, his son-in-law testified that, when he returned home at approximately 9:45 o'clock p.m., the Petitioner was not there. In addition, the Petitioner's daughter testified that the Petitioner was not at her home at 6:00 o'clock p.m. on the evening in question, and that she did not recall whether he had returned home before 10:00 o'clock p.m.

[4]Following that interview, the police collected fingerprints, and blood and hair samples, from the Petitioner.

the BCA, using the polymerase chain reaction methodology ("PCR"), as well as the restriction fragment length polymormorphism ("RFLP") approach. First, PCR analysis was conducted on the blood drop which was found on the abdomen of Sandburg, and this test determined that the drop contained a mixture of blood from at least two persons. The analysis also excluded Rebecca Blanco, and Jon Sandburg as possible sources of the blood sample.[5] However, Sandburg, Michael Sandburg, and the Petitioner, were not excluded as possible sources of the sample. Next, RFLP testing was performed on the blood drop taken from the top of Sandburg's shoe. The analysis of this drop matched the DNA profile from known blood samples of the Petitioner. This DNA profile did not match the DNA profile of Sandburg, Rebecca Blanco, Jon Sandburg, or Michael Sandburg. The probability that an unrelated individual, who should be selected at random from the general population, would have a DNA profile of this type was 1 in 16.5 million. Finally, RFLP testing was performed on the combined three drops of blood discovered on the floor next to Sandburg, and on the drop that was discovered on her abdomen. All of these samples contained a mixture of blood from at least two people. The DNA profile, which was obtained from these

[5]Rebecca Blanco is the Petitioner's daughter, from a prior marriage, while Jon Sandburg, and his brother, Michael Sandburg, are Sandburg's sons from a previous marriage.

combined DNA samples matched the DNA profile from the Petitioner's known blood sample, and did not match the DNA profile of Sandburg, Rebecca Blanco, or Jon or Michael Sandburg. The probability that an unrelated individual, who should be selected at random from the general population, would have a DNA profile of this type was 1 in 16.5 million.

After receiving the DNA findings, officers from the Burnsville Police Department proceeded to the Petitioner's residence in order to effect his arrest, and to search for additional evidence. At the time of his arrest, the Petitioner's pickup truck was found to contain his passport, birth certificate, financial documents, credit cards, a Mexican map, Mexican entry documents, Mexican currency, and camping equipment. Subsequently, the Petitioner was indicted on charges of Murder in the First Degree (Premeditation), Murder in the First Degree (While Committing Burglary), Murder in the Second Degree (Intentional Murder), and Murder in the Second Degree (Order for Protection).

At Trial, Sandburg's divorce attorney testified that Sandburg had filed for marital dissolution on July 24, 1996. During the course of the dissolution, both Sandburg and the Petitioner had moved for the exclusive use, and possession, of their marital home. Ultimately, a Court Order granted temporary use, and possession of

the home, to Sandburg, and restrained the Petitioner from harassing Sandburg.

Sandburg's divorce attorney also read into evidence an Affidavit, which was signed by the Petitioner, and which described Sandburg as "narcissistic" and "exploitive." According to the divorce attorney, prior to the time that Sandburg was granted possession of their home, the Petitioner had gained access to the home notwithstanding being locked out of the premises by Sandburg.

The Minnesota Supreme Court, in State v. Schneider, 597 N.W.2d 889, 892 (Minn. 1999), recounted the Petitioner's testimony, as follows:

> [Next], Schneider testified in his own defense. On cross-examination, he read into evidence part of a letter that he wrote in 1993 or 1994 regarding being locked out of the Judicial Road home. In that letter, Schneider wrote, "I got so mad. It's a good thing then that I'm not a violent person or I would have killed her right there." He also read part of a document dated February 6, 1997, in which he wrote, "I am a married male having just turned 59 years of age. I have greatly diminished self-esteem. I am extremely frustrated. I believe that I am on the verge of severe depression or rage."
>
> Schneider also read into evidence a letter he had written to a friend in February 1997, in which he wrote:
>
> "And to top everything off Dorothy is being one monster of a lying bitch. I don't know if I had mentioned anything about her neurotic condition. She has not been diagnosed profes-

> sionally, but without doubt she has narcissistic mental disorder.
>
> Additionally, Schneider responded in the affirmative when asked, in regard to the impending divorce, whether Sandburg had control and was prepared and whether "the next judge was going to do like the first and not listen to [him] and give the woman all the breaks."

Following this testimony, the State introduced the evidence derived from the BCA's DNA analysis of the blood samples obtained at the murder. The Minnesota Supreme Court explained the presentation of that evidence as follows:

> The state introduced extensive testimony regarding DNA evidence. Schneider did not object to the introduction of the DNA evidence. His attorney expressly waived a Frye hearing with respect to polymerase chain reaction (PCR), one of the two types of DNA testing performed in this case, conceding that "it's pretty well known that PCR * * * is pretty much acceptable in terms of scientific standards."
>
> Delores Schoenbauer, a BCA analyst, testified she performed two types of tests on the five blood drops that originated from the crime scene. The first test, PCR, uses a kit from the Perkin-Elmer Company to "amplify" the amount of DNA present in a sample. Once the amount of DNA is amplified, the test results come back in the form of dots at varying locations on a strip, which represent alleles. The results can then be compared to other test results to eliminate possible contributors to the sample. Through the PCR test, Schoenbauer determined that each of the five drops of blood originating from the scene was a mixture of two or more persons' DNA. Schoenbauer testified that from each evidence sample, Sand-

burg, one of Sandburg's sons, and Schneider could not be eliminated as possible contributors. Schoenbauer further testified that Schneider's DNA was consistent with the "predominant DNA types" from each of the five samples. Schoenbauer also testified that the likelihood of a random person matching the evidence samples was 1 in 27,900 Caucasians, 1 in 120,000 African-Americans, and 1 in 18,400 Native Americans.

The second test Schoenbauer performed was restriction fragment length polymorphism (RFLP), which "fragments" the DNA. Results are obtained in the form of an autorad, a small strip that depicts bands present in the DNA. These autorads are then compared to other autorads to eliminate possible contributors to the sample. RFLP is more discriminating than PCR. Schoenbauer felt that there was not enough DNA present in the drops from Sandburg's abdomen and the entryway floor to perform RFLP, and therefore combined these four samples into one sample and performed RFLP on the combined sample. She also performed RFLP on the shoe sample. Schoenbauer determined that the DNA in the combined sample and the shoe sample matched Schneider's DNA, and that the probability of a random match was 1 in 16.5 million persons.

At trial, the defense called into question the procedures used by the BCA in both the collection and analysis of the blood samples. There was extensive cross-examination of the state's experts and the defense had two of its own expert witnesses. In preparation for trial the defense experts had access to all of the BCA's laboratory notes and results, as well as pictures of the crime scene. The defense alleged the following errors: (1) the absence of blind controls during certain parts of the analysis; (2) the lack of a control called substrate testing, which is testing of a sample taken from an unstained portion of the same item

from which the blood sample was taken; (3) the BCA's policy of not always changing gloves between handling of every sample; (4) the BCA's policy of working on more than one case and more than one sample at a time; (5) the BCA's policy allowing an analyst to know which samples were from the victim, the suspect, and the evidence, as possibly contributing to biased results; (6) incorrect attribution of certain aspects of the PCR test results to one contributor and others to another contributor, which could have resulted in an improper match and inaccuracy regarding the probability of a random match; (7) an inaccurate date on a control; (8) an inaccurate case number written on a set of results when Schoenbauer had been working on two cases at the same time; (8) inaccurate results written for analysis on a sample that produced no results; (9) an admission by Schoenbauer that nothing in the BCA protocol would allow her to combine the four blood drops to perform one RFLP test, an action that prohibited discovery of which drop produced which results in the RFLP test; and (10) a problem with the temperature at which the Perkin-Elmer PCR kit is run.

Based on the results and the multiple alleged errors in the collection and analysis of the samples, the defense's expert witness opined that both the PCR and RFLP test results were "unreliable" and "inconclusive." He further testified that the results of both the RFLP tests were "consistent with contamination." The defense offered no evidence of any specific violation of the BCA's written protocol or of the Technical Working Group on DNA Analysis Methods (TWGDAM). See State v. Jobe, 486 N.W.2d 407, 419-20 (Minn. 1992)(discussing need for compliance with appropriate written protocol and TWGDAM guidelines).

State witnesses testified that most of the alleged errors were not errors at all. Schoenbauer conceded making some errors, but testi-

> fied that the errors were merely transcription errors that were promptly corrected and did not in any way affect the results of the tests. A state rebuttal witness testified that, given the quality and quantity of DNA the BCA had to work with, the results were "excellent," "valid," and reliable. He also testified that he would not consider the results consistent with contamination.
>
> The jury found Schneider guilty of each charged offense, and the trial court sentenced him on the first-degree premeditated murder verdict.

Id. at 892-894.

Following his conviction in the Trial Court, the Petitioner appealed to the Minnesota Supreme Court, on the ground that the evidence presented at Trial was not sufficient to support the Jury Verdict. Specifically, on appeal, the Petitioner conceded that the only element of first-degree murder that was at issue was identity. Id. at 894. The Minnesota Supreme Court rejected the Petitioner's contentions in an published decision filed on July 15, 1999. Id.

On July 10, 2000, the Petitioner filed his present Petition for a Writ of Habeas Corpus, in which he seeks to overturn his original conviction, based upon the same arguments that he had raised in his State Court appeal. To reiterate, the Petitioner asserts that the evidence presented at his Trial was legally insufficient to sustain his convictions as a matter of law. In this respect, the Petitioner questions the methods and procedures employed by the BCA in the collection, and in the DNA analysis, of the blood sam-

ples obtained at the murder scene. In opposition to the Petition, the Respondent argues that the Petitioner's conviction was proper, because a reasonable trier of fact could conclude, beyond a reasonable doubt, that the Petitioner murdered Sandburg. As we shall explain, we agree with the Respondent, and we recommend that the Petition be denied.

III. Discussion

The Sufficiency of Evidence.

A. Standard of Review. The Petitioner contends that the evidence submitted at his Trial was insufficient, as a matter of law, to sustain his convictions. "[A] district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Title 28 U.S.C. §2254(a). Thus, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). Accordingly, before a Writ may issue, the Petitioner must establish that the State's exercise of custody over his person is an affront to the Constitution, a Federal law, or a Federal treaty. Pruett v. Norris, 153 F.3d 579, 582 (8th Cir. 1998); Robinson v. Leapley, 26 F.3d 826, 829 (8th Cir.

1994); Maynard v. Lockhart, 981 F.2d 981, 986 (8th Cir. 1992); Garcia v. Powers, 973 F.2d 684, 685 (8th Cir. 1992).

Congress has recently restricted the scope of a Federal Court's review of Habeas Petitions, whose underlying claims have been adjudicated in a State Court. See, Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996). A Federal District Court's authority to vitiate State Court decisions, by the granting of a Writ of Habeas Corpus, is now limited to the narrow class of claims which have exhausted all State Court remedies, and which involve an adjudication that either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Title 28 U.S.C. § 2254(d); see also, Thiel v. Schutzle, 200 F.3d 1120, 1122 (8th Cir. 1999).

In Lindh v. Murphy, 96 F.3d 856, 870 (7th Cir. 1996), rev'd on other grounds, 521 U.S. 320 (1997), the Court of Appeals for the Seventh Circuit stated that " * * * a reasonable decision by the state court must be honored." Id. at 871. Thus, where a petitioner challenges a State Court's application of law to fact, re-

lief is possible only where no reasonable jurist would view the State Court's ruling as correct. See, Jackson v. Johnson, 150 F.3d 520, 523 (5th Cir. 1998). Since "Section 2254(d)(1) requires federal courts to take into account the care with which the State Court considered the subject," a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment." Lindh v. Murphy, supra at 869. As stated in Lindh, a State Court decision, which is within the bounds of what the Supreme Court has determined to be reasonable, must be respected, "not because it is right, * * * but because the grave remedy of upsetting a judgment entered by another judicial system after full litigation is reserved for grave occasions." Id. at 871.

Further, in reviewing a habeas petition in which the sufficiency of the evidence supporting the petitioner's original conviction is challenged, our Court of Appeals has stated:

> This court must view the evidence in the light most favorable to the government and sustain the verdict if it is supported by substantial evidence. Moreover, on appeal, the government must be given the benefit of all inferences that may logically be drawn from the evidence. It is not necessary that the evidence exclude every reasonable hypothesis except guilt; instead, the evidence is simply sufficient if it will convince a trier of fact beyond a reasonable doubt that the defendant is guilty. This court will not disturb a conviction if the evidence rationally supports two conflicting hypotheses. Each of the elements of the crime charged may be proven by circumstantial evi-

> dence, as well as by direct evidence. And finally, this court must keep in mind that the standard to be applied to determine the sufficiency of the evidence is a strict one, and the finding of guilt should not be overturned lightly.

Hill v. Norris, 96, F.3d 1085, 1088 (8th Cir. 1996), citing United States v. Brown, 921 F.2d 785, 791 (8th Cir. 1990)(citations and quotation omitted).

Our function as a reviewing Court, therefore, is not to reweigh the evidence. United States v. Anderson, 78 F.3d 420, 422 (8th Cir. 1996). To the contrary, we must accord "great deference" where a State Appellate Court has found the evidence supporting the conviction constitutionally sufficient, as the Minnesota Supreme Court here concluded. Ward v. Lockhart, 841 F.2d 844, 846 (8th Cir. 1988).

B. Legal Analysis. The Petitioner argues that the evidence, which was presented at his Trial, was legally insufficient to support his conviction, primarily because of the inherent unreliability of the collection, and DNA analysis methods, that were employed by the BCA. We disagree.

We have carefully reviewed the Minnesota Supreme Court's resolution of the Petitioner's challenges to his convictions, and we conclude that its decision was based upon a reasonable assessment of the facts, in light of the evidence presented in the State Court proceedings. As noted by the Minnesota Supreme Court, the evidence presented at Trial demonstrated that the Petitioner had both the

opportunity, and the motive, to kill Sandburg. First, there was no evidence of a burglary at the time that Sandburg was murdered. Thus, the Jury could reasonably discount burglar as a motive for Sandburg's killing. Moreover, at Trial, the Jury was presented with testimony that the Petitioner was angry with Sandburg concerning their marital dissolution, and the resulting affect that the dissolution would have upon the Petitioner's finances. As noted by the Minnesota Supreme Court:

> At the time of Sandburg's death, the marital dissolution trial was one week away. Schneider had told a co-worker that the only way he could keep his money was if Sandburg was dead. Schneider also was the beneficiary of Sandburg's life insurance policies worth over $200,000. Schneider was familiar with the Judicial Road home, and had broken into the home twice in the months preceding Sandburg's death.
>
> Furthermore, Schneider's claimed whereabouts at the time of the killing could not be confirmed, and was in fact contradicted by the testimony of his son-in-law. When Schneider was informed of Sandburg's death, he did not inquire as to the cause for 49 minutes. When asked who might have motive to harm Sandburg, Schneider told police that her sons were the beneficiaries on her life insurance, although he stood to gain over $200,000 from various insurance policies on Sandburg's life. Schneider also testified and denied killing Sandburg. The jury had ample opportunity to assess Schneider's credibility.

State v. Schneider, supra at 895.

Given that credibility determinations are for the Jury to resolve, it is not our function to question the substantiality of this testimony where, as here, it is legally competent for the Jury's consideration. See, Daniels v. Wood, 819 F.2d 195, 198 (8th Cir. 1987); see also, U.S. v. Stroh, 176 F.3d 439 (8th Cir. 1999)(in reviewing the sufficiency of evidence to support a conviction, the Court can neither weigh the evidence, nor assess the credibility of the witnesses); U.S. v. Hawkey, 148 F.3d 920 (8th Cir. 1998). As such, we must accept the Jury's finding that this evidence supported a Verdict that the Petitioner was guilty of killing Sandburg.

While the Petitioner continues to challenge the reliability of the DNA evidence, which was presented at Trial, in our considered view, this evidence was sufficient to warrant the Jury's finding that the Petitioner was guilty of crimes of which he was charged. At Trial, the Jury was presented with testimony from Delores Schoenbauer ("Schoenbauer"), who was a BCA analyst. Schoenbauer testified that the combined sample of the blood drops, which were found on Sandburg's abdomen, and on the floor next to Sandburg, matched the DNA profile of the Petitioner. Schoenbauer also testified that the blood sample, which was found on Sandburg's shoes, matched the DNA profile of the Petitioner, and that the probability of a random match was 1 in 16.5 million.

In order to challenge this testimony, the Petitioner enlisted the aid of an expert witness, who testified that, due to a variety of errors, the evidence was unreliable. However, the State rebutted this testimony by presenting a State rebuttal witness who testified that the results of the BCA's DNA tests were valid, and reliable, and that there was no evidence that contamination took place. Thus, prior to rendering its Verdict, the Jury was presented with conflicting expert testimony on the DNA issue. As noted by the Minnesota Supreme Court:

> The defense extensively cross-examined the state's experts, retained their own experts to testify, and focused on alleged problems with the state's DNA testimony in final argument. Thus, the jury had the opportunity to evaluate Schneider's efforts to discredit both the credibility of the state's expert witnesses and the reliability of the DNA analysis and results. * * * The jury had ample opportunity to evaluate the conflicting expert testimony.

State v. Schneider, supra at 895.

While the Petitioner would have us totally revisit the same contentions that he presented to, and that were resolved by, the Minnesota Supreme Court, we are not at liberty to do so. As we have already observed, our function, as a reviewing Court, is not to reweigh the evidence, as if we were the finder-of-fact. See, United States v. Anderson, supra at 422. To the contrary, we are obliged to extend "great deference" to the Minnesota Supreme Court's decision. See, Ward v. Lockhart, supra at 846.

Here, the Petitioner has failed to demonstrate that the decision of the Minnesota Supreme Court was unreasonable, and therefore, that decision withstands further review. Nevertheless, our independent review of the evidence, which was presented at the Petitioner's Trial, persuades us that, when viewed in a light most favorable to the government, it was sufficient to sustain the Jury's Verdict. Therefore, we recommend that the Petitioner's request for Habeas relief be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Respondent's Motion to Dismiss the Petition for Writ of Habeas Corpus [Docket No. 10] be granted, and that the Petition [Docket No. 1] be dismissed with prejudice.

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

**N O T I C E**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than March 16, 2001,** a writing which specifically identifies those portions of the Report

to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than March 16, 2001,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.